MacCONAGHY & BARNIER, PLC
JOHN H. MacCONAGHY, State Bar No. 83684
JEAN BARNIER, State Bar No. 231683
645 First St. West, Suite D
Sonoma, California 95476
Telephone: (707) 935-3205
Facsimile: (707) 935-7051
Email: jbarnier@macbarlaw.com

Attorneys for Trustee
TIMOTHY W. HOFFMAN

UNITED STATES BANKRUPTCY COURT

NORTHERN DISTRICT OF CALIFORNIA

In re )
) Case No. 09-12470
KAREN V. KAYNE, aka ) (Chapter 7)
KAREN K. MITCHELL )
) **DECLARATION OF JEAN BARNIER**
) **IN SUPPORT OF**
Debtor. ) **MOTION FOR SANCTIONS**
) **AGAINST DEBTOR'S COUNSEL**
**PER 11 U.S.C. § 707(b)(4)(C)and (D),**
**BANKRUPTCY RULE 9011, AND**
**N.D. CAL. CIV. R. 11-6**

I, Jean Barnier, state:

1. I am an attorney admitted to the bar of this Court and am counsel of record for the Chapter 7 Trustee in this case.

2. Attached to this declaration and labelled Exhibit 1 are excerpted portions of the debtor's 2004 Examination taken on March 3, 2010.

3. Attached to this declaration and labelled Exhibit 2 is a certified transcript of excerpts of the debtor's First Meeting of Creditors held on September 3, 2009.

///

///

///

4. Attached to this declaration and labelled Exhibit 3 is a copy of Notice of Motion and Motion to Enforce Settlement in the matter of *Kayne v. Ed Haury* SCV 241886.

5. My hourly billing rate is $300 an hour. The costs involved in bringing this action include: 5 hours for preparing and conducting the 2004 Examination of the debtor including a document request; 4.3 hours for researching issues under §§ 707 and 9011; 1.2 hour for telephone and email consultations with the Trustee; .6 hour for discussion with attorney for defendant Haury; 5.4 hours for preparing and revising the Motion for Sanctions; and an anticipated additional 10 hours for preparing and handling the evidentiary hearing in this matter for a total of 26.5 hours. In addition, the cost of the adversary proceeding and the transcripts are $760.50 for a total of $8,710.50.

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct, that I have personal first-hand knowledge thereto, that if called as a witness, I could and would testify competently thereto, and that this declaration was executed on April 7, 2010 at Sonoma, California.

      /s/ Jean Barnier
Jean Barnier
*Attorneys for Trustee*

# EXHIBIT 1

```
 1            IN THE UNITED STATES BANKRUPTCY COURT

 2          FOR THE NORTHERN DISTRICT OF CALIFORNIA

 3                         - - - -

 4

 5   IN RE                    )
                              )
 6   KAREN V. KAYNE,          )   CASE NO.:  09-12470
     AKA KAREN K. MITCHELL,   )
 7                            )   (CHAPTER 7)
           DEBTOR.            )
 8   _____)

 9

10

11             DEPOSITION OF KAREN VAN KAYNE

12

13

14   DATE:         March 3, 2010

15

16   TIME:         10:10 a.m.

17

18   LOCATION:     MacCONAGHY & BARNIER, PLC
                   645 First Street West
19                 Suite D
                   Sonoma, California  95476
20

21   REPORTED BY:  Diane Dearmore
                   Certified Shorthand Reporter
22                 License Number 12736

23

24

25
```

14

1  today, Ms. Kayne. Can you describe your education for
2  me since high school?
3      A. I did not finish high school. I took the GED.
4  I went back to college in 1975, took some classes.
5  Left, got married, had three kids, went back to college
6  in 1983. Went to Diablo Valley College, majored in
7  chemistry. Took a lot of human anatomy and science
8  classes. Got divorced. Went back to college about --
9  let's see. I think I took some classes in the '80s.
10      In 1992 I went through the Napa Valley Police
11 Academy. Went to Santa Rosa Junior College. Went
12 through some classes at Los Guilicos in terms of law
13 enforcement corrections and juvenile counseling. Got a
14 degree in administration of justice. Basically
15 considered myself to be a criminalist with the degree
16 that I had. Dean's highest honors.
17      Q. And is your degree in criminal justice, is
18 that a BA --
19      A. I have an AS and an AA in administration of
20 justice. An AA in general education with emphasis in
21 psychology. A two-year certificate in corrections. A
22 two-year certificate in corrections and law enforcement
23 and in juvenile counseling.
24      Q. Did you ever work in a law office?
25      A. I worked as a private investigator, and I had

15

1  a private investigator branch office for a while.
2      Q. Did you ever work as a legal secretary for
3  anyone?
4      A. No, but I would like to.
5      Q. Did you ever have --
6      A. Do you have a job for me?
7      MR. ORTON: Not likely.
8      Q. (By Ms. Barnier) I'm sure our two assistants
9  would be raising an eyebrow saying we like our jobs
10 right now. Did you ever work as a paralegal for anyone?
11     A. No.
12     Q. Now, I have some questions about your life
13 insurance. On your schedules you said that you paid
14 $660 a month for life insurance. Is that correct?
15     A. My kids -- my kids had insurance policies, but
16 they're gone.
17     Q. But are you paying currently 660 --
18     A. No.
19     Q. So you're not paying $660 a month for
20 insurance?
21     A. No.
22     Q. Are you paying anything for insurance?
23     A. $37.
24     Q. Do you know where that number came from on
25 your schedules that said that you were paying $660 a

16

1  month?
2      A. That was incorrect.
3      Q. And what type of life insurance do you have?
4  Is it -- do you have whole life?
5      A. I currently have a $500,000 term policy
6  through Farmers, but I'm ready to cancel it.
7      Q. And who is the insured on that policy?
8      A. I am.
9      Q. And it's a life insurance policy, not an
10 annuity; is that correct?
11     A. Correct. Term policy. It's a 10-year policy
12 ready to expire in about a year and a half.
13     Q. Now, on your schedules it says your sons live
14 with you; is that correct?
15     A. My son -- I have four sons, one daughter. And
16 they are boomerang children in and out of the house.
17     Q. So not any one of them resides with you
18 fortunately. It's just that they may come and go
19 depending on their financial situations. Would that be
20 a correct statement?
21     A. If they would pay rent, they are welcome to
22 return. I've just recently packed one of my son's
23 clothes and put them in bags, and he picked them up last
24 night. And he is not earning enough to pay rent, and he
25 can't stay there anymore.

17

1      Q. Before you filed for bankruptcy, were any of
2  your children contributing to the household expenses?
3      A. No. They were just consuming my money.
4      Q. And I apologize. We're going to have to take
5  a break -- here it is. I'm sorry. It's buried in here.
6      (EXHIBIT NO. 2 MARKED.)
7      Q. (By Ms. Barnier) And what I am showing you is
8  a copy of the schedules and bankruptcy petition that was
9  filed in your case.
10     A. Okay.
11     Q. Do you recognize this document?
12     A. Vaguely.
13     Q. Do you remember signing this document?
14     A. No. I never did sign this document.
15     Q. Let me just direct your -- there are a number
16 of places for your signature. I just want to make sure
17 that as we look at this, if it doesn't refresh your
18 memory that perhaps you had signed it. If you could
19 turn to page 3 of 26. Go the other way. I'm sorry.
20 Yeah, page 3.
21     A. Okay.
22     Q. And do you see where it's typed in Karen V.
23 Kayne? Do you see that?
24     A. Yes, I do.
25     Q. Do you remember signing this document with

26

1 Q. Okay. And it's your testimony today that you
2 have entered into a confidential agreement with New York
3 Life that does not allow you to speak about that company
4 in any circumstances; is that correct?
5 A. I cannot talk about that.
6 Q. Without speaking to the particulars of any
7 confidential agreement that you have arrived at, are you
8 receiving funds from this agreement?
9 A. I cannot talk about that company.
10 Q. I'm not asking you to talk about the company.
11 In terms of a bankruptcy, all money that you receive you
12 must disclose in a bankruptcy. I'm not asking you to
13 talk about your terms of agreement. I'm not asking you
14 to disclose any information other than do you receive
15 monies from New York Life Insurance per a settlement
16 agreement that you entered into?
17 A. What I can tell you is what is a matter of
18 public record. There was a class-action lawsuit against
19 a particular company. They settled out of court for
20 $10 million. It was distributed to all of us that were
21 not paid minimum wage.
22 Q. Are you still receiving monies from this
23 settlement?
24 A. I received $3,000 from a settlement a long
25 time ago.

27

1 Q. And is that the end of the monies you have
2 received from that settlement?
3 A. I don't know.
4 Q. Do you remember approximately when you
5 received those monies?
6 A. I can find out.
7 MS. BARNIER: Let's go off the record.
8 (Off the record.)
9 MS. BARNIER: What Ms. Kayne has handed me was
10 a check in the amount of $3,392.71 in a -- appears to be
11 in a settlement of a class-action suit filed. And the
12 check is dated April 28, 2009, regarding a class-action
13 suit that was approved in Los Angeles.
14 Q. (By Ms. Barnier) Thank you for that
15 (indicating).
16 A. Uh-huh.
17 Q. So as you look at Schedule I, if you look at
18 line 13, if you will, of your bankruptcy petition, do
19 you see line 13?
20 A. Yes.
21 Q. It says other monthly income.
22 A. Yes.
23 Q. And it says specify. Is there a reason you
24 did not list the payments that you were receiving here?
25 A. I supplied this entire binder to Mr. Orton.

28

1 He extracted the information that he thought he needed
2 to disclose, and he made his decision of what to put on
3 this document.
4 Q. Did you tell Mr. Orton that you were receiving
5 money on this promissory note?
6 A. It was in this binder, and he had this binder.
7 Q. Okay. May I take a look at that?
8 A. Sure. (Indicating).
9 Q. Thank you.
10 A. Some of the documents I just extracted and
11 handed to you.
12 Q. So it's your testimony today that all of these
13 documents were given to Mr. Orton?
14 A. Yes.
15 Q. I'm going to ask my assistant to make a copy
16 and hand that back to you. So we'll go off the record,
17 and just bear with me for one minute.
18 (Recess.)
19 MS. BARNIER: For the record, Mr. Orton has
20 left the 2004 examination, and has asked his client if
21 she is comfortable continuing on because he had another
22 appointment.
23 Q. (By Ms. Barnier) And, Ms. Kayne, have you
24 said you're comfortable proceeding without your attorney
25 present?

29

1 A. I don't feel he's been compensated in
2 representation for me through this entire matter, so
3 what difference does it make if he leaves?
4 Q. I'm sorry. I think you told me this, and let
5 me just re-ask because I'm forgetting. Are you
6 presently employed right now?
7 A. I'm unemployed. It's on those documents right
8 there in front of you.
9 Q. Did you verbally tell Mr. Orton that you were
10 receiving cash payments on this promissory note?
11 A. They were not cash. They were by check.
12 Q. By check. Did you tell him you were receiving
13 payments?
14 A. Yes.
15 Q. Do you remember when you told him that?
16 A. When I asked him to collect the money from
17 him.
18 Q. And that was prior to the filing of the
19 bankruptcy?
20 A. Yes.
21 Q. Okay. Do you remember what you told Mr. Orton
22 about the promissory note?
23 A. I told him that this is a white-collar
24 criminal that's been terrorizing me that owes me a lot
25 of money, and has put me in the position of having all

### 34

1    A. Yes, this is accurate and complete.
2    Q. Okay.
3       (EXHIBIT NOS. 3-4 MARKED.)
4    Q. (By Ms. Barnier) This is a handwritten
5 Settlement Agreement and Mutual General Release. Whose
6 handwriting is this?
7    A. Ms. Venner, the mediator.
8    Q. And what I don't see on this settlement is the
9 original amount of the loan. Can you tell me how much
10 that was?
11    A. $125,000.
12    Q. And according to the promissory note that you
13 have provided me, interest ran at 12 percent; is that
14 correct?
15    A. Correct.
16    Q. Okay. Now, when did you make that loan to the
17 Santa Rosa Executive Center?
18    A. July -- I have a copy of the check. Let's
19 see. Why don't you go ahead and take a copy of that
20 check? That was minus the title insurance fee.
21 (Indicating).
22    Q. I'm going to return the copy of this receipt
23 back to you, but it's dated July 24, 2006, is when you
24 funded the loan to Santa Rosa Executive Center and Ed
25 Haury; is that correct?

### 35

1    A. Correct.
2    Q. Okay. Let me give you that back.
3 (Indicating). Why did you loan them the money?
4    A. I was introduced to Mr. Haury when they
5 purchased Nicholas Turkey facility here in Sonoma. He
6 needed an appraisal and a loan. I was introduced to him
7 by Barry Hines who was at Keegan & Coppin and was a
8 client.
9      He provided me numerous years life tax returns
10 for numerous entities. Showed me a net worth of
11 approximately $15 million. Showed that his wife made a
12 million dollars a year. Showed that his companies were
13 doing quite well. I found out later that some of those
14 tax returns were fraudulent.
15      I helped him obtain an appraisal for the
16 Nicholas Turkey facility knowing that I was going to be
17 doing the loan as an agricultural property through
18 Farmer Mac. I found out later that he had committed
19 fraud in many, many aspects of that transaction.
20 Unfortunately, it was after I had loaned him the money.
21 I felt that it was a safe loan.
22    Q. And he requested the monies from you. Is that
23 how the loan began?
24    A. Yes. And I'm not the only victim. There are
25 at least 12 other victims in Sonoma. One's a

### 36

1 72-year-old attorney which he got $500,000 from.
2    Q. And what was the source of the monies that you
3 provided for the loan?
4    A. Came out of my home equity line of credit on
5 my primary residence which my children and I were living
6 in.
7    Q. And then in January of 2009 you entered into
8 this settlement agreement; is that correct?
9    A. Correct.
10    Q. Okay. And according to this agreement you
11 were to be paid $112,500; is that correct?
12    A. Correct.
13    Q. And in this it states the terms. And I
14 understand it's your testimony that the payments may
15 have been one to three days late, but between January
16 through November the payments were all made; is that
17 correct?
18    A. Yes.
19    Q. Okay. And then the final payment was due
20 December 7th of 2009 in the amount of $61,251; is that
21 correct?
22    A. Yes.
23    Q. And you did not receive that amount; is that
24 correct?
25    A. I went to the courthouse and did research on

### 37

1 Mr. Haury and saw that he had filed for legal separation
2 from his wife three days before our court date. And so
3 that gave me an indication that he had no intention of
4 making that payment.
5    Q. But he didn't -- he did not make that payment
6 to you of $61,251?
7    A. No, he did not.
8    Q. But he did make the payments after you filed
9 bankruptcy of $1,250; is that correct?
10    A. Yes. And I did testify to the trustee that
11 those payments were coming in and due.
12    Q. Okay. Did you ever tell Mr. Orton that this
13 was a confidential agreement?
14    A. Yes.
15    Q. And what is your understanding of this
16 confidential agreement?
17    A. We had a lengthy discussion about the
18 confidentiality of this agreement. And he said that
19 disclosing the court case on the bankruptcy filing would
20 suffice, and that it is the due diligence of the
21 bankruptcy trustee to investigate the matter, to pull
22 the file and to find out the specifics of the
23 confidential agreement.
24    Q. What's your understanding of the
25 confidentiality of this agreement that you entered into

Case: 09-12470    Doc# 31-1    Filed: 04/07/10    Entered: 04/07/10 13:30:31    Page 7 of 20

### 42

1  Q. So on December 8th you visited Mr. Orton. And
2  what did he tell you?
3     A. I told him that Judge Tansil recommended that
4  I go on his law and motion calendar to get a judgment
5  because the money was owed to my mortgage company. I
6  was $35,000 behind, and I was in jeopardy of
7  foreclosure. I had been on my fourth loan modification,
8  and they were not -- Citibank was not really following
9  the new federal regulations to modify on my loan.
10        I had signed a modification document before
11 filing bankruptcy. They agreed to reduce my first from
12 $3,737 to $2,325. I made the three probationary
13 payments, and then I made six payments after that.
14        So this money that came in from Mr. Haury went
15 directly to Citibank. Citibank neglected to tell me
16 that there was also a new federal regulation that if
17 you're on unemployment, that you only have to pay the
18 escrow impound account. I asked them about that. They
19 said they didn't know anything about it. So basically
20 they took all my money, and I'm still in jeopardy of
21 foreclosure, and I still owe them an extra $35,000. And
22 there's still a home equity line of credit lien upon the
23 property in the amount of almost $400,000 plus the
24 650,000, which means my house is under for about
25 $600,000.

### 43

1  Q. Let me go back. So you go to Mr. Orton on the
2  8th and say I need your assistance.
3     A. Yes.
4     Q. And what did he do for you?
5     A. He said you should file an ex parte motion for
6  order shortening time. I said, okay, do you think it's
7  a real good idea. He said, yes, I think it's a good
8  idea, I will help you write it. I need $500 cash. And
9  so I did and he wrote it. I took it to Judge Tansil's
10 chambers, and he did not sign it.
11    Q. And you said that was on December 23rd that
12 you were in Judge Tansil's court?
13    A. No. It was before Christmas. I have it
14 written here somewhere.
15    Q. Could you find a copy of that?
16    A. Okay. IRS audit. I went and did this because
17 I went through this, too. She said I should go to work
18 for the Feds. This is what I gave to Mr. Orton
19 (indicating). So this must have been the day he wrote
20 it. It was December 14th. I paid him $500. I don't
21 think I have it because it was not approved.
22    Q. Okay. Let's go off the record.
23       (Off the record.)
24    Q. (By Ms. Barnier) So --
25    A. You know, I have -- and this will be very

### 44

1  helpful to you. I have two copies of this. I made it
2  for Judge Tansil, and I told him I had exhibits A
3  through Q and asked him if he wanted them, and he said
4  no thank you. So I do have an extra copy of this
5  (indicating).
6     Q. And by this, this is the --
7     A. These are supporting documents. Amounts owed,
8  letters from Mr. Haury, statement of financial position
9  of Ed and Bethnee Haury, assets of Ed and Bethnee Haury.
10 A printout of his website showing his Silicon Valley
11 holdings, including numerous multi-million dollar
12 buildings. An email that I sent to First American Title
13 before I signed the confidential mediation agreement
14 explaining that I was owed $180,606, and asked them why
15 they never disclosed to me on any of the five
16 preliminary title reports that it was eSephus.
17       And also a letter came from First American
18 Title in February 2009 asking me for numerous documents
19 because I was planning on making a claim to the title
20 insurance, and then also supplied me with the State of
21 California Secretary of State Foreign Limited
22 Partnership Application For Registration signed by Mr.
23 Haury, and a filing which proved to me that he had lied
24 during mediation.
25    Q. Okay.

### 45

1     A. I also have a document in here that showed
2  that my trust was overdrawn $341.94 because he was
3  bouncing checks on me. A copy of a page of my bank
4  statement showing numerous overdraft charges, and the
5  payment to Farmers Life Insurance, which the payment --
6  $34.08 for the $500,000 term policy that I have. A
7  statement from KK Financial, which was my company, minus
8  $64.92. And a page of the attorney's fees showing that
9  I had paid Mr. Barbose $3,131.25 and Mr. Orton $500,000
10 (sic) in regards to this case to try to collect.
11    Q. You just said $500,000.
12    A. $500. What's the difference when you don't
13 have any money? Sorry.
14    Q. So let me go back to one of the documents you
15 handed me which was a receipt for legal services.
16       (EXHIBIT NO. 6 MARKED.)
17    Q. (By Ms. Barnier) You had explained earlier
18 that you paid Mr. Orton $500 to draft an ex parte
19 motion; is that correct?
20    A. Yes.
21    Q. And that was on the -- you paid him on the
22 14th of December; is that correct?
23    A. Yes.
24    Q. And the ex parte motion was to accomplish
25 what?

**46**

1 A. To get into court to enforce the confidential
2 mediation settlement agreement and to get a judgment for
3 the $61,251 owed by Mr. Haury.
4 Q. And Judge Tansil refused to sign it on that
5 basis, according to you, and advises you to file a
6 motion to enforce the judgment; is that correct?
7 A. Yes. He said that it should not be an ex
8 parte motion because it was not an emergency situation,
9 and advised me to please file on his law and motion
10 calendar.
11 Q. Okay. And did you ask Mr. Orton to help you
12 do that?
13 A. Yes, I did.
14 Q. And as you look at this document entitled
15 Notice of Motion and Motion To Enforce Settlement, who
16 drafted this document?
17 A. Mr. Orton did.
18 Q. And did you pay Mr. Orton to do this?
19 A. Yes. I paid him $500.
20 Q. You paid him an additional $500?
21 A. No. I told him he had misunderstood my
22 request. And his advice was to file an ex parte motion.
23 And when I told him that Judge Tansil had said go on the
24 law and motion calendar -- Mr. Orton advised that I go
25 and file an ex parte motion, but it was not accepted by

**47**

1 Judge Tansil. And I explained to him that he did not
2 understand my request, and I needed something drafted to
3 go to the law and motion calendar to get a judgment.
4 Q. Okay. So then he drafted this document for
5 you which describes the settlement, and has a
6 declaration by you as to its accuracy, and then he
7 serves it out of his office; is that correct?
8 A. Correct.
9 Q. It's signed by --
10 A. His wife.
11 Q. Hang on. And that's Deborah Orton who is the
12 proof of service?
13 A. Yes.
14 Q. And it was served from his office regarding
15 the enforcement of that. Did you appear on February 2nd
16 to this hearing?
17 A. I did.
18 Q. And what was the result of that hearing?
19 A. I disclosed to Judge Tansil -- and this was my
20 intent from the very beginning and the advice of
21 Mediator Venner, that if Mr. Haury did not pay on this,
22 that I could take this matter to the federal court
23 through a bankruptcy, which was my intent in the first
24 place.
25 And I told Judge Tansil that I had filed

**48**

1 bankruptcy and that this money needed to be collected.
2 And he gave me -- he said that if I prepared an order
3 and a judgment and submitted it to him, that he would
4 sign it.
5 Mr. Haury had hired new counsel, Mr. Beckwith,
6 who appeared and I met for the first time. In the
7 hallway he told me, Karen, you're never going to get
8 this money. And he tried to intimidate me before we
9 went into the courtroom, and I broke into tears in the
10 courtroom. And Judge Tansil said he would sign the
11 order, and Beckwith did not object.
12 Q. Okay. And then you were aware that the
13 bankruptcy case was re-opened; is that correct?
14 A. Correct.
15 Q. Okay. And did Mr. Orton explain to you why
16 the bankruptcy case was re-opened?
17 A. No.
18 Q. Okay. Did Mr. Orton explain to you that the
19 monies due on the promissory note are property of the
20 estate, of your bankruptcy estate, and not your money?
21 Did he explain that to you?
22 A. Mr. Orton does not explain much.
23 Q. Did Mr. Orton explain to you that you face the
24 possibility of having your bankruptcy discharge revoked?
25 A. No, he did not.

**49**

1 Q. Okay.
2 A. He said to me specifically don't worry about
3 it, Karen. That's nothing to worry about. Everything
4 is fine. You have your bankruptcy discharge.
5 Q. When did he tell you that?
6 A. When he told me that the bankruptcy had been
7 re-opened.
8 THE REPORTER: I need to go off the record
9 briefly.
10 (Off the record.)
11 Q. (By Ms. Barnier) As you look over your
12 schedules today, you've explained to me that there were
13 some mistakes made on them. One, the failure to list a
14 promissory note. Two, that the amount that you pay for
15 insurance, life insurance, is not $660 a month. As you
16 look them over, are there any other assets that have not
17 been listed on this bankruptcy schedule that you owned
18 at the time you filed bankruptcy?
19 A. No other assets. I did call him the day I saw
20 it, which was the day before the bankruptcy trustee
21 hearing. And I said, what on earth does this mean 420
22 something a month, where did you get this number. I
23 said, this is not correct. He said, don't worry about
24 it. I said, what do you mean don't worry about it. I
25 said, where did you get this number. And he said, well,

# EXHIBIT 2

Golden Gate Reporting

1
1 UNITED STATES BANKRUPTCY COURT
2 FOR THE NORTHERN DISTRICT OF CALIFORNIA, SANTA ROSA
3
4 IN RE:                              :
5 KAREN V. KAYNE,                     :
6 Aka KAREN K. MITCHELL,              : Case Number 09-12470
7 17682 Carriger Road                 :
8 Sonoma, California  95476           :
9
10                              Office of the U.S. Trustee
11                              777 Sonoma Avenue #116
12                              Sonoma, California  95404
13
14                              Wednesday,
15                              September 3, 2009
16
17     The above-entitled matter came on for Meeting of
18 Creditors, pursuant to notice, at 2:00 p.m.
19
20     BEFORE:   TIMOTHY W. HOFFMAN
21               Bankruptcy Trustee
22
23
24
25

1 private money note. He went into foreclosure. I tried
2 to collect. We went to mediation.
3     THE TRUSTEE: So you have a note against
4 somebody?
5     THE WITNESS: Had. It's -- it went into
6 foreclosure. It's not his anymore.
7     THE TRUSTEE: Somebody signed a promissory
8 note in your favor?
9     THE WITNESS: Correct.
10    THE TRUSTEE: For how much money?
11    THE WITNESS: Originally, it was $125,000.
12    THE TRUSTEE: And what do you mean by
13 originally? Was it modified?
14    THE WITNESS: That was the face value, yes.
15    THE TRUSTEE: And where -- when was it
16 modified and in what amount?
17    THE WITNESS: Some time ago we went to
18 mediation and he agreed to pay $1,225 a month for a
19 period of time until he pays, I think it was, 50
20 percent of the principal and he's been paying on it, so
21 there's not much left for him to pay. I think it's up
22 in December.
23    THE TRUSTEE: Okay. I'm not sure that's
24 listed. Is that in -- in your Assets? Is that listed
25 in your Schedule of Assets?

1         MR. ORTON:  No, I don't think it is, because I
2   was under the impression that it is essentially
3   uncollectible.
4         THE WITNESS:  He's --
5         MR. ORTON:  He defaulted on the agreement, the
6   settlement agreement, and so it's -- isn't that case
7   still pending then?
8         THE WITNESS:  It is still pending and I'm
9   having a hard time collecting from him.
10        THE TRUSTEE:  So it's secured by something?
11        THE WITNESS:  Not any more.  It was secured by
12  the commercial building that he had in Santa Rosa that
13  went into foreclosure.  So it was auctioned off.
14        THE TRUSTEE:  So a senior claim wiped you out
15  in their foreclosure?
16        THE WITNESS:  I didn't realize that he had
17  $11,000 in unpaid property taxes and there were
18  unrecorded deeds in front of me, so I was in fifth
19  position.
20        THE TRUSTEE:  Okay.  And who's the guy that
21  owes you the money?
22        THE WITNESS:  Santa Rosa Executive Center,
23  Limited Partnership, Nevada Corporation, incorporated
24  in Delaware.
25        THE TRUSTEE:  Okay.  And did it have any other

1  assets, besides the building that was foreclosed?
2          THE WITNESS:  No.
3          THE TRUSTEE:  Okay.  When was the last time
4  you received a payment on the note?
5          THE WITNESS:  He did make a payment last
6  month.
7          THE TRUSTEE:  And you say you're getting a
8  thousand what a month?
9          THE WITNESS:  1,225 a month.
10         THE TRUSTEE:  And according to your
11 calculations, if he pays you regularly through
12 December, it'll all be satisfied in full?
13         THE WITNESS:  Yes, he's -- he's a little bit
14 behind, but I think he will catch up.  I'd rather --
15         THE TRUSTEE:  Well, how much is he going to
16 have to pay to pay this thing off?  If we just said,
17 you know, September, October, November, December,
18 that's about 5,000 bucks, but if he's behind and he
19 needs to --
20         THE WITNESS:  I think it's about 7,000.
21         THE TRUSTEE:  I'll leave it to you whether you
22 want to amend the Schedules, but it sounds like an
23 asset to me.
24         MR. ORTON:  Yeah.  I mean, what figure do you
25 put in there, just that?

1           THE TRUSTEE: He's making the payments.

2           MR. ORTON: Yeah. That's frankly news.

3           THE TRUSTEE: I -- I think that it's -- it
4  would be exempt.

5           MR. ORTON: I think there's --

6           THE TRUSTEE: You've got room.

7           MR. ORTON: -- enough left.

8           THE TRUSTEE: I'm not going -- it's not -- so
9  I'm not going to get involved, but, you know, that's
10 why I say I leave it to you if you want to amend the
11 Schedules. You don't have to do it for my benefit, but
12 there are a lot of other reasons to do it.

13          MR. ORTON: Yeah. I think -- I think I
14 probably will.

15          THE TRUSTEE: Are there any other -- are there
16 any creditors here in this case?

17          [No response.]

18          THE TRUSTEE: Okay. There being no creditors,
19 I have no further questions.

20          The hearing is concluded. Thank you.

21          [Whereupon, at 2:08 p.m., the Meeting of
22          Creditors was concluded.]

23                    * * * * *

24

25

# EXHIBIT 3

```
KAREN VAN KAYNE
P.O. BOX 695
EL VERANO, CA 95433
(707) 996-4555

IN PRO PER
```



ENDORSED FILED
DEC 15 2009
SUPERIOR COURT
OF CALIFORNIA
COUNTY OF SONOMA

SUPERIOR COURT OF THE STATE OF CALIFORNIA

IN AN FOR THE COUNTY OF SONOMA

| | |
|---|---|
| KAREN VAN KAYNE, an individual; and KAREN VAN KAYNE, trustee of the KAREN K. MITCHELL FAMILY TRUST OF 1991,<br><br>Plaintiff,<br><br>vs.<br><br>SANTA ROSA EXECUTIVE CENTER, LP; and ED HAURY, et al.,<br><br>Defendants. | Case No.: SCV 241886<br><br>NOTICE OF MOTION AND MOTION TO ENFORCE SETTLEMENT AND FOR ENTRY OF JUDGMENT THEREON; MEMORANDUM OF POINTS & AUTHORITIES; DECLARATION OF KAREN VAN KAYNE AND EXHIBITS<br><br>[ CCP § 664.6]<br><br>Date: FEB - 2 2010<br>Time: 8:30 am<br>Dept.: 18 |

PLEASE TAKE NOTICE THAT on FEB - 2 2010, 2010, at 8:30 a.m./p.m. or as soon thereafter as the matter may be heard in Department 18 of the above-entitled Court, located at 3055 Cleveland Ave, Santa Rosa CA 95403, Plaintiff, KAREN VAN KAYNE, will and hereby does move this court for and Order Enforcing Settlement and Entry of Judgment Thereon. This motion is made pursuant to California Code of Civil Procedure section 664.6 and is based on this notice of motion and motion, memorandum of points and authorities in support thereof, the declaration of KAREN VAN KAYNE in support thereof, the pleadings and other papers on file in this case and any other information that may be offered.

DATED: December 14, 2009          By: /s/ Karen van Kayne, Trustee
                                       KAREN VAN KAYNE/Plaintiff

///
///
///
///
///

NOTICE OF MOTION AND MOTION TO
ENFORCE SETTLEMENT AND ENTRY OF
JUDGMENT THEREON

-- 1 --

## I. BRIEF STATEMENT OF RELEVANT FACTS

Plaintiff loaned Defendant Santa Rosa Executive Center and Ed Haury $125,000.00 which was evidenced by a promissory note given to Plaintiff by these Defendants. Plaintiff alleged that Santa Rosa Executive Center and Ed Haury breached the terms of the note and having been unsuccessful at enforcing the terms of the note outside litigation, Plaintiff filed the instant action.

The parties hereto agreed to participate in mediation and the case was resolved at mediation pursuant to the terms of the <u>Settlement Agreement and Release</u> attached hereto as **Exhibit A** and incorporated herein by this reference.

The Settlement was executed by and between Karen Van Kayne, an individual, and Karen Van Kayne as trustee of the Karen K. Mitchell Family Trust of 1991, on the one hand, and Ed Haury on the other hand. Ed Haury was to pay to Karen Van Kayne the sum of $112,500.00 (One hundred and twelve thousand and five hundred dollars) one each consecutive month, beginning January, 2009. The final payment was due on December 7, 2009, in the amount of $61,250.00 (Sixty-one thousand two hundred and fifty dollars). The final payment was not made, and is now past due.

Karen Van Kayne has advised the court at several case management conferences that Mr. Haury is consistently late with his payments. The court has consistently responded that Ms. Kayne could file a motion to enforce the settlement through entry of judgment thereon and thus Ms. Kayne brings the instant motion.

## II. MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION TO ENFORCE SETTLEMENT

California Code of Civil Procedure section 664.6 provides:

> "If parties to pending litigation stipulate, in a writing signed by the parties outside the presence of the court or orally before the court, for settlement of the case, or part thereof, the court, upon motion, may enter judgment pursuant to the terms of the settlement. If requested by the parties, the court may retain jurisdiction over the parties to enforce the settlement until performance in full of the terms of the settlement."

Ed Haury and Karen Van Kayne settled the instant matter at mediation and the Settlement Agreement was written up by the mediator, at the mediation, and in the presence of both parties. Both Ms. Van Kayne, and Mr. Haury signed the Agreement. Only the party who brings the motion and the

| | |
|---|---|
| 1 | party against whom judgment is sought must sign the Agreement, and such is the case here. (*Harris v.* |
| 2 | *Rudin, Richman & Appel* (1999) 74 CA4th 299) . Each signed the Agreement personally, and Ms. Van |
| 3 | Kayne signed it also in the name of the Karen K. Mitchell Family Trust of 1991. |
| 4 | Page 7 of the Settlement Agreement provides that the court shall retain jurisdiction over this |
| 5 | matter to enforce the terms of the Settlement and that the prevailing party on any motion brought to |
| 6 | enforce the settlement will be entitled to recover his/her attorneys fees and costs. (See **Exhibit A** |
| 7 | 7:IV.2) |

### III. CONCLUSION

Plaintiff respectfully requests that this Court enter judgment against Ed Haury under the terms of the Settlement Agreement executed by and between herself and Mr. Haury on January 7, 2009. Mr. Haury has failed to perform under the terms of the Agreement he signed and thus entry of judgment is proper under California Code of Civil Procedure section 664.6.

DATED: December 14, 2009    By: /s/ Karen van Kayne, Trustee
KAREN VAN KAYNE *in pro per* and as trustee
of the KAREN K. MITCHELL FAMILY TRUST OF 1991

### DECLARATION OF KAREN VAN KAYNE

I, KAREN VAN KAYNE, declare:

1. I have personal knowledge of the matters stated in this declaration and would and could competently testify thereto if called upon to do so. I am the Plaintiff in the instant action and trustee for Plaintiff, KAREN K. MITCHELL FAMILY TRUST OF 1991.

2. Myself and Ed Haury signed a Settlement Agreement at mediation on January 7, 2009. Mr. Haury made 11 of the 12 payments called for under the terms of the Agreement, though each payment was late, some by several days. The final payment was due on December 7, 2009, and to date I have not received said payment.

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct. Executed this 14th day of December, 2009, at Sonoma, California.

/s/ Karen van Kayne, Trustee
KAREN VAN KAYNE

NOTICE OF MOTION AND MOTION TO
ENFORCE SETTLEMENT AND ENTRY OF         -- 3 --
JUDGMENT THEREON

Case: 09-12470    Doc# 31-1    Filed: 04/07/10    Entered: 04/07/10 13:30:31    Page 19 of 20

## PROOF OF SERVICE BY MAIL

I, Deborah A. Orton, declare that:

I am a citizen of the United States and a resident of Sonoma County California and am not a party to this action. My business address is **414 1st East Suite 1, P.O. Box 1922, Sonoma CA. 95476**

On December 15, 2009 I served the following document/s: **Notice of Motion and Motion to Enforce Settlement and for Entry of Judgment Thereon** on the interested party(ies) identified herein below by:

☒ **BY MAIL** – by placing a true copy of the above referenced document/s with postage thereon fully prepaid for first-class mail, for collection and mailing at Sonoma, California, following ordinary business practices. I am familiar with the practice of our office for processing of correspondence, said practice being that in the ordinary course of business, correspondence is deposited in the United States Postal Service the same day as it is placed for processing.

☐ **BY FACSIMILE-** I caused said document to be transmitted by Facsimile machine to the number indicated after the address(es) noted above.

☐ **BY PERSONAL SERVICE-** I caused such document(s) to be hand delivered to the offices of the person(s) served.

I declare under the laws of the State of California that the foregoing is true and correct. Executed this 15th day, of December 2009 at Sonoma, California.

*Deborah A. Orton*
Deborah A. Orton

**Parties Served**

Ed Haury
P.O. Box 376
Sonoma. CA. 95476

Proof of Service -1-